**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF IOWA**
**WESTERN DIVISION**

JAMES B. KITTERMAN and DIANE
KITTERMAN,

Plaintiffs,

vs.

COVENTRY HEALTH CARE OF
IOWA, INC.,

Defendant.

No. C 09-4046-MWB

**MEMORANDUM OPINION AND
ORDER REGARDING ACTION FOR
JUDICIAL REVIEW OF ERISA
BENEFITS DETERMINATION**

———————————

**TABLE OF CONTENTS**

*I. INTRODUCTION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
   *A. Factual Background* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
   *B. Plan Terms* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
   *C. Procedural History* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*II. LEGAL ANALYSIS* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
   *A. Standard Of Review* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
   *B. Need For Further Proceedings* . . . . . . . . . . . . . . . . . . . . . . 14
   *C. The Denial Of Benefits* . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
      *1. Arguments of the parties* . . . . . . . . . . . . . . . . . . . . . . 17
         *a. The Kittermans' arguments* . . . . . . . . . . . . . . . 17
         *b. Coventry's response* . . . . . . . . . . . . . . . . . . . . 18
         *c. The Kittermans' reply* . . . . . . . . . . . . . . . . . . 18
      *2. Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*III. CONCLUSION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

In this action, originally filed in state court, the plaintiffs sought a judgment in the amount of medical expenses that the defendant insurance company has declined to pay, plus interest and costs. The insurance company removed the action to this federal court on the ground that the action is governed by the Employee Retirement Income Security Act (ERISA), 29 U.S.C. § 1001 *et seq.*, because it is an action to recover benefits allegedly due to the plaintiffs under the terms of the plan, to enforce rights they allege that they possess under the terms of the plan, or to clarify their rights, if any, to future benefits under the terms of the plan within the meaning of 28 U.S.C. § 1132(a)(1)(B). The essence of the parties' dispute is whether the plaintiffs are responsible for any more than $8,000 of the medical expenses in question, as that is the amount identified in the plan as the annual "out-of-pocket maximum" for an individual for treatment from "non-participating providers," where the insurance company has declined to pay medical expenses totaling almost three times that amount, on the ground that various costs do not "apply" to the "out-of-pocket maximum."

## I.  INTRODUCTION

### A.  Factual Background

There does not appear to be any dispute as to the facts underlying this lawsuit concerning payment of health insurance benefits. Plaintiffs James and Diane Kitterman reside in Spencer, Clay County, Iowa, where they own and operate a staffing service business called Employment Connections, Inc. (ECI). In September of 2008, the Kittermans had a health insurance policy (the Plan) through their employment with ECI that was provided and administered by defendant Coventry Health Care of Iowa, Inc.

(Coventry). The plan provided different levels of benefits, if the medical services in question were provided by a "participating" or "non-participating" provider.

On August 29, 2008, Dr. Brian Wilson, of Northwest Iowa Surgeons, determined that Diane presented a high suspicion of ovarian cancer, so he referred her to a gynecological oncologist at the Mayo Clinic in Rochester, Minnesota. The Kittermans also assert that Dr. Wilson strongly recommended that Diane have her procedure done at the Mayo Clinic, so he set up a referral appointment at the Mayo Clinic for September 9, 2009.

The Administrative Record reflects that, on September 4, 2009, Diane contacted Coventry by telephone to ask if her medical services at the Mayo Clinic would be covered by Coventry. *See* Administrative Record at 81-82. Diane represents, and Coventry does not dispute, that a customer service representative (CSR) told Diane that the Mayo Clinic was an "out-of-network" or "non-participating" provider, and that coverage would be based on the out-of-network benefits schedule. The "Issue Detail" from the September 4, 2009, contact indicates that the CSR told Diane that the University of Iowa Hospitals and Clinics were "in-network" or "participating" providers, and that, despite what the Kittermans' doctor was telling them, it was highly unlikely that they would be able to get the "in-network" benefits for treatment at the Mayo Clinic, because there were comparable providers in the network at a comparable distance. *Id.* The parties apparently agree that the travel time to Rochester, Minnesota, from the Kittermans' home in Spencer is about 3 hours, while the travel time to Iowa City, Iowa, is about 4-1/2 hours. The Kittermans assert that Diane also asked whether or not there were any additional charges besides the out-of-pocket maximum for out-of-network coverage, but she was simply told to refer to the Plan; she was not told that she would be liable for any amount greater than the out-of-pocket maximum, nor was "out-of-pocket maximum" or any exclusions from it defined for

her. Although nothing in the portions of the Administrative Record cited by the Kittermans indicates this inquiry or response, Coventry apparently does not dispute either the fact or content of the query or the response.

The Kittermans assert that they reviewed the Schedule of Benefits in their Coventry Health Care Plan booklet, which noted the out-of-pocket maximum for an individual per calendar year for services from a non-participating provider would be $8,000, as compared to $4,000 for services from a participating provider. Administrative Record at 3. The Kittermans assert that the Schedule of Benefits does not state or refer to any possible additional costs on either of the first two pages. Therefore, they decided that paying the extra $4,000 to treat Diane's suspected ovarian cancer at the Mayo Clinic was worth the additional money, in light of Dr. Wilson's recommendation and the avoidance of additional travel time to Iowa City.

Diane was admitted to the Mayo Clinic on September 9, 2008, and released on September 21, 2008. Upon their return home, the Kittermans received a letter dated September 9, 2008, from Coventry, entitled "Authorization Notification," concerning Diane's anticipated treatment. Administrative Record at 83-84. That letter stated, in pertinent part, the following:

> COVENTRY HEALTH AND LIFE INSURANCE
> COMPANY (hereafter known as the "Plan") received a
> request to authorize coverage of the above procedure by the
> above named provider(s) [Rochester Methodist Hospital and
> Mayo Clinic Rochester]. At least one of these providers is
> not a contracted provider for the Plan. Based on the clinical
> information submitted by the requesting provider, all or part
> of the payment of above procedure/service is authorized under
> your out-of-network benefits. The reason that the services
> have been authorized at a lower, out-of-network level of
> reimbursement is that providers are available in-network and

4

the requested provider is not contracted with the Plan. The Plan has no contractual authority of [sic] agreement with any non-network, non-participating and/or non-contracted providers.

Your out-of-network benefit is for services delivered by physicians, facilities, and other providers not contracted with the Plan. Your financial responsibility is at the lower, out-of-network level of benefits, likely requiring you to pay a substantial portion of the cost, as listed on the Schedule of Benefits. Additionally, the following may apply:

- If the non-network provider charges more than our established out-of-network rate, you will be responsible for the amount over such out-of-network rate.

- Penalties and/or charges above the Plan's out-of-network rate do not apply toward your out-of-pocket maximums.

Administrative Record at 83. The Kittermans assert that this letter, which they received only after Diane had been treated, provided the first indication that they might owe far in excess of $8,000 for Diane's treatment at the Mayo Clinic.

The Kittermans eventually received an Explanation of Benefits (EOB), Administrative Record at 108-09, indicating that the Plan paid $20,670.83 for out-of-network services, out of a total of $44,458.99, and that they were responsible for $23,788.16. The Kittermans represent that they paid $8,000 to Rochester Methodist Hospital, but have left the remaining $15,768.16 unpaid and accruing penalties and interest.

The Kittermans appealed the denial of payment of benefits in excess of the $8,000 out-of-pocket maximum through two levels of administrative appeals with Coventry, but

both appeals were unsuccessful. Administrative Record at 91-109 (first-level appeal); 110-20 (second-level appeal). This lawsuit followed.

## B. *Plan Terms*

There appears to be no dispute, at least now, that the Kittermans' health insurance Plan is an employee welfare benefit plan within the meaning of ERISA, 29 U.S.C. § 1002(1), in that the Plan was sponsored by the Kittermans' employer, ECI. The Plan documents for the Kittermans' Plan with Coventry in the Administrative Record consist of a Schedule of Benefits, Administrative Record 2-4, and Evidence of Coverage, Administrative Record at 5-79.

As the Kittermans acknowledge, the first two pages of the Schedule of Benefits are set out in two columns, labeled "BENEFITS" and "MEMBER PAYS," with the second column subdivided into "Participating Providers" and "Non-Participating Providers." Administrative Record at 2-3. Various categories of "BENEFITS" are asterisked, referring to a note on page two of the Schedule of Benefits that states, "Precertification/Preauthorization is required. Financial penalties may apply if prior approval is not obtained." The "Out-of-Pocket Maximum" in the Schedule of Benefits for an "individual per calendar year" for "Participating Providers" is $4,000, but for "Non-Participating Providers," it is $8,000 ("Family per calendar year" entries are, respectively, $8,000 and $16,000). Administrative Record at 3. Approximately the bottom one-third of the second page of the Schedule of Benefits is left blank, which the Kittermans contend "does not invite the participant to continue to turn the page." Plaintiff's Brief (docket no. 17) at 5.

There is, however, a third page to the Schedule of Benefits, Administrative Record at 4, which consists of explanations and definitions of various terms. The two entries on this third page that are pertinent to the present action are the following:

> Out-of-Network Rate—The Out-of-Network Rate is the maximum amount covered by Us for approved out-of-network services. This rate will be derived from either a Medicare based fee schedule or a percent of billed charges as determined by Us. **You are responsible for Charges that exceed our Out-of-Network Rate for Non-Participating Providers. This could result in you having to pay a significant portion of your claim. Balances above the Out-of-Network Rate do NOT apply to your Out-of-Pocket Maximum.**

> Out-of-Pocket—The Individual Out-of-Pocket Maximum is a limit on the amount You must pay out of Your pocket for specified Covered Services in a calendar year, as specified in this Schedule of Benefits. The family Out-of-Pocket Maximum is the limit on the total amount Members of the same family covered under this Agreement must pay for specified Covered Services in a calendar year. Coinsurance and Deductible amounts apply to your Out-of-Pocket Maximum. **Copayments and Charges that exceed our Out-of-Network Rate for Non-Participating Providers do not apply to your Out-of-Pocket Maximum.** You will be responsible for office visit copayments throughout the calendar year.

Administrative Record at 4 (emphasis in the original).

Coventry describes the Evidence of Coverage as "a detailed summary of the Plan's terms." Defendant's Brief (docket no. 22) at 3. This assertion, of course, begs the question of what, then, is the Plan? The court finds that the Evidence of Coverage states,

> The Agreement between Coventry Health and Life, Inc. (hereafter called the "Health Assurance PPO", "PPO", "CH&L", "We", "Us", or "our") and You and between

7

CH&L and Your Dependents as Members of CH&L is made up of:

- This Evidence of Coverage, amendments and addendums ("Certificate");
- The Enrollment Form;
- The Schedule of Benefits;
- Applicable Riders; and
- The Group Policy.

In the absence of any evidence to the contrary, the court must conclude that the statement of the terms and conditions of the Plan in the Evidence of Coverage is entirely consistent with the terms of the actual Plan, as those terms are presumably stated in the "Group Policy" or other documents that "[t]he Agreement . . . is made up of," but which are not part of the Administrative Record here.

The front matter of the Evidence of Coverage consists of what the court will call a "greetings" page and a brief description of the Plan.[1] The front matter includes the following caution:

> **THIS AGREEMENT SHOULD BE READ AND RE-READ IN ITS ENTIRETY.** Many of the provisions of this Certificate are interrelated; therefore, reading just one or two provisions may give You a misleading impression. Many words used in this Agreement have special meanings. These words will appear capitalized and are defined for You. By using these definitions, You will have a clearer understanding of Your Coverage.

Administrative Record at 8 (emphasis in the original).

---

[1] What the court has called a "brief description" is not, and does not purport to be, a Summary Plan Description (SPD) within the meaning of ERISA and applicable regulations.

After a Table of Contents, the Evidence of Coverage continues with a statement of terms and conditions of coverage under the Plan. The provisions of the Plan that appear to be most obviously relevant here are the following:

## 1.2 In-Network and Out-of-Network Options

The benefits payable under the Group Policy may vary depending upon whether services are provided by a Participating or Non-Participating Provider

Check Your Schedule of Benefits to see if Your plan Covers the same services under both the In-Network and Out-of-Network Options.

Out-of-Network services may be provided in or out of Our Service Area. The Out-of-Network Option may or may not Cover the same health services as the In-Network Option. Refer to Your Schedule of Benefits for specific In-Network and Out-of-Network benefits.

When using the In-Network or Out-of-Network Option, You may make appointments directly with the Provider of Your choice. Health services provided will be Covered under the In-Network or Out-of-Network Option only if the services are Medically Necessary and are not subject to any limitation or exclusion. The Provider may ask to see Your identification card to verify Coverage, or may contact Us regarding Coverage of billing procedures.

* * *

## 1.4 Non-Participating Providers

When you receive Covered services from Non-Participating Providers, You will not receive any of the

advantage that Our contracts with Participating Providers offer. You may also be missing out on savings and increased benefits You would receive if services were performed by a Participating Provider. When You receive Covered services from Non-Participating Providers, all of the following apply:

- Covered services You receive in the office may be subject to a Deductible.

- Your Coinsurance is calculated using a higher percentage than for Covered services You receive from Participating Providers.

- Non-Participating Providers are not responsible for filing Your claims.

- We do not have contracts with Non-Participating Providers and they do not agree to accept Our payment arrangements. Our allowed amount will be the lesser of billed charges or the Out of Network Rate. You are liable for any difference between the billed charge and Our allowed amount. This difference does not apply to Your Out-of-Pocket Maximum.

- Non-Participating Providers do not agree to participate in Our Utilization Management Program.

- When we settle claims with You, You are responsible for Your Non-Participating Provider's entire billed charge. When We settle a claim with a Non-Participating Provider, You are responsible for the balance between Our Payment and the Non-Participating Provider's billed charges.

\* \* \*

## 1.7    Out-of-Pocket Maximum

The individual Out-of-Pocket Maximum is a limit on the amount You must pay out of Your pocket for specified Covered Services in a Calendar Year, as specified in Your Schedule of Benefits. The family Out-of-Pocket Maximum is the limit on the total amount Members of the same family Covered under this Agreement must pay for specified Covered Services in a Calendar Year. Copayments and financial penalties do not apply to Your Out-of-Pocket Maximum. You will be responsible for office visit Copayments throughout the Calendar Year.

\* \* \*

## 13.42 "Out-of-Network Rate"

The maximum amount Covered by Us for approved Out-of-Network services. This rate will be derived from either a Medicare based fee schedule or a percent of billed charges as determined by Us. You are responsible for Charges that exceed our Out-of-Network Rate for non-participating providers. This could result in You having to pay a significant portion of Your claim. Balances above the Out-of-Network Rate do NOT apply to Your out-of-pocket maximum. Please feel free to contact the Plan regarding the Out-of-Network Rate methodology.

Administrative Record at 14, 15, 18, and 73 (emphasis in the original).

### C. Procedural History

On April 27, 2009, the Kittermans filed a Petition At Law - Jury Demanded against Coventry in the Iowa District Court in and for Clay County, asserting that they are entitled to judgment in the amount of the unpaid Mayo Clinic bill, plus interest as provided by law and the costs of this action. Notice of Removal (docket no. 1), Exhibit B.[2] On June 3, 2009, Coventry filed a Notice of Removal (docket no. 1), removing this action to this federal court, asserting that this action is governed by ERISA and is, therefore, an action over which this federal court would have original jurisdiction, without respect to the amount in controversy, pursuant to 29 U.S.C. § 1132(e)(1) and (f) and 28 U.S.C. § 1331. The same day, Coventry filed an Answer (docket no. 2) denying that the Kittermans are entitled to any relief and asserting various affirmative defenses. Also on June 3, 2009, Coventry filed a Motion To Strike Jury Demand (docket no. 3), asserting that the Kittermans are not entitled to a jury on the claims that they have asserted under ERISA and that any other claims are preempted by ERISA. By Order (docket no. 8), dated June 24, 2009, Chief United States Magistrate Judge Paul A. Zoss granted Coventry's Motion To Strike Jury Demand, to which no response had been filed, and to which Judge Zoss found that the Kittermans could not have asserted a valid objection.

On August 27, 2009, Judge Zoss entered a Scheduling Order For A Claim-Review Case Filed Under ERISA (docket no. 9), establishing a briefing schedule for the Kittermans' judicial review action. Pursuant to the Scheduling Order, as subsequently amended at various times, the parties filed the Administrative Record (docket no. 14) under seal on October 16, 2009; the Kittermans filed what was docketed as a Brief And

---

[2]A copy of the state court Petition was also separately filed in this action on June 4, 2009, as docket no. 4.

Request For Trial (docket no. 17) on November 13, 2009; Coventry filed its Brief (docket no. 22) on January 15, 2010; and the Kittermans filed a Reply (docket no. 23) on February 16, 2010.

## II.  LEGAL ANALYSIS

### A.  Standard Of Review

Section 1132(a)(1)(B) of Title 29 of the United States Code provides that a participant may bring a claim under ERISA for denial of benefits, as follows:

> **(a)** Persons empowered to bring a civil action
>
> A civil action may be brought—
>
> **(1)** by a participant or beneficiary—
>
> > * * *
> > **(B)** to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan.

29 U.S.C. § 1132(a)(1)(B).  As the Supreme Court recently reiterated, this section of ERISA "permits a person denied benefits under an employee benefit plan to challenge that denial in federal court." *Metropolitan Life Ins. Co. v. Glenn*, ___U.S. ___, 128 S. Ct. 2343, 2346 (2008).  Thus, the Kittermans' action falls squarely within § 1132(a)(1)(B).

The first question that the court must resolve—and one on which the parties have provided no help—is what standard of review to apply to this action for judicial review. In *Glenn*, the Supreme Court also reiterated that "[p]rinciples of trust law require courts to review a denial of plan benefits 'under a *de novo* standard' unless the plan provides to the contrary." *Id.* at 2348 (quoting *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101,

115 (1989)).  Neither party has identified any provision of the Plan giving Coventry, as the Plan administrator, discretion to construe the terms of the Plan, or even discretion to determine eligibility under the Plan.  Therefore, the court concludes that the standard of review in this case is *de novo*.  *Id.*  Moreover, a de novo standard of review is applicable when the question before the court is an issue of contract, a question of law, as it is here. *See Halbach v. Great-West Life & Annuity Ins. Co.*, 561 872, 877 n.3 (8th Cir. 2009) (the court "note[d] for clarification" that it was applying a de novo standard of review, because it was "reviewing whether the affected welfare benefits were vested or not, an issue of contract; a question of law").The Eighth Circuit Court of Appeals has explained, "When reviewing an ERISA plan de novo, we interpret the terms of the plan by 'giving the language its common and ordinary meaning as a reasonable person in the position of the [plan] participant, not the actual participant, would have understood the words to mean.'" *Adams v. Continental Cas. Co.*, 364 F.3d 952, 954 (8th Cir. 2004) (quoting *Hughes v. 3M Retiree Med. Plan*, 281 F.3d 786, 789-790 (8th Cir. 2002), in turn citing *Chiles v. Ceridian Corp.*, 95 F.3d 1505, 1511 (10th Cir. 1996)); *accord Halbach*, 561 F.3d at 877 (also citing *Hughes*).

### B.  Need For Further Proceedings

In their Brief (docket no. 17), the Kittermans requested, *inter alia*, that the court set an evidentiary hearing.  In its Brief (docket no. 22), Coventry asserted that the Kittermans are not entitled to any further hearing or consideration of evidence beyond the Administrative Record, because they had not shown "good cause" for any omissions from the Administrative Record, although Coventry stated that it would welcome the opportunity for oral arguments, if the court should feel that oral arguments would be of assistance.  In their Reply (docket no. 23), the Kittermans asserted that they had shown "good cause" for

a trial based on Coventry's handling of this matter and their views and perceptions, but they also represented that they would welcome the opportunity for oral arguments, if the court declined to hear further evidence.

The Eighth Circuit Court of Appeals has observed, "As to [a participant's] claim for benefits, a trial court conducting a de novo review may expand the scope of what it will consider beyond the evidence that was before the plan administrator at the time it made its decision if 'good cause' to do so exists." *Koons v. Aventis Pharms., Inc.*, 367 F.3d 768, 780 (citing *Donatelli v. Home Ins. Co.*, 992 F.2d 763, 765 (8th Cir. 1993)); *accord Rittenhouse v. UnitedHealth Group Long Term Disability Ins. Plan*, 476 F.3d 626, 630 (8th Cir. 2007) ("In an ERISA benefits-denial case, a district court may consider evidence not in the administrative record 'if the plaintiff shows good cause' for its omission." (citing *Brown v. Seitz Foods, Inc. Disability Benefit Plan*, 140 F.3d 1198, 1200 (8th Cir. 1998)). For example, the lack of a "true administrative record" would allow a trial court, in its discretion, to consider additional evidence. *Id.* In this case, however, there is a "true administrative record." *See id.* Moreover, prior to the filing of their Reply, the Kittermans had not shown what, if anything, they would have included in the Administrative Record, let alone any "good cause" for failing to include any further evidence in the Administrative Record—certainly, they did not raise the question of whether an evidentiary hearing or trial was required in response to Coventry's Motion To Strike Jury Demand or in response to the court's directive to file a proposed scheduling order. *See Rittenhouse*, 476 F.3d at 630 (the plaintiff must show "good cause" for the omission of evidence not in the administrative record).

The Kittermans asserted in their Reply that they had shown "good cause" to consider evidence outside of the administrative record, including evidence of Coventry's handling of this matter and their views and perceptions. However, this court generally will

not consider arguments made for the first time in a reply brief. *See, e.g., Armstrong v. America Pallet Leasing, Inc.*, ___ F. Supp. 2d ___, 2009 WL 2611540 n.19 (N.D. Iowa Aug. 26, 2009) (noting that inclusion of a new argument in a reply is contrary to N.D. IA. L.R. 7.1(g) and practice in this circuit, citing cases). The court will not do so here, because the court does not find "good cause" for the failure to identify the evidence in question prior to the Kittermans' Reply. Even if the court were to consider the Kittermans' Reply on this point, their identification of evidence that they would present to the court is neither sufficiently specific to be illuminating, nor would such evidence have any reasonable probability of changing the outcome in this case, which the court finds turns on the language of the Schedule of Benefits, the Evidence of Coverage, and what a reasonable plan participant, not *these* plan participants, would understand the terms of the plan to mean. *Adams*, 364 F.3d at 954 ("When reviewing an ERISA plan de novo, we interpret the terms of the plan by 'giving the language its common and ordinary meaning as a reasonable person in the position of the [plan] participant, not the actual participant, would have understood the words to mean.'" (quoting *Hughes*, 281 F.3d at 789-790, in turn citing *Chiles*, 95 F.3d at 1511)).

In short, the court concludes that there is no need for the court to open the record to any further evidence or to hold an evidentiary hearing or trial of any kind, where the Administrative Record is adequate and, indeed, the Plan documents speak for themselves. Similarly, the court finds the parties' briefing to be adequate, so that oral arguments are not necessary to the court's disposition of this matter. This action will be resolved on the Administrative Record and the parties' written arguments.

### C. The Denial Of Benefits

### 1.    *Arguments of the parties*

#### a.    *The Kittermans' arguments*

The Kittermans contend that Coventry should be bound for the coverage summarized in the Schedule of Beneits.  They argue that, from the perspective of an average plan participant, the only conclusion that could be reached from reviewing the Schedule of Benefits is that Coventry is responsible for all services provided in excess of the out-of-pocket maximum.  Specifically, they assert that the blank section at the bottom of page two of the Schedule of Benefits "does not invite the participant to continue to turn the page," so that a reasonable plan participant would rely on the first two pages of the Schedule of Benefits, which contain no restrictions on medical expenses that apply to the "out-of-pocket maximum."  They also assert that nowhere does the Schedule of Benefits state in any of the entries before the out-of-pocket maximum that the coinsurance after the deductible continues to apply after the out-of-pocket maximum reached, in the case of services provided by non-participating providers.  They point out that the Schedule of Benefits *does* expressly state on page two that "[p]enalties do not apply to out-of-pocket maximums," so that Coventry clearly knew how to and could indicate when charges did not apply to out-of-pocket maximums.

Running through all of the Kittermans' contentions is their assertion that the Schedule of Benefits is a summary plan description (SPD), although they try to assert that this is a separate issue, which would simply make resolution of the case simpler.  This argument is critical to their claim, they contend, because the terms of the SPD prevail over the terms of the Plan, when there is a conflict.  The Kittermans also assert that, because the Schedule of Benefits fails to meet all of the requirements of an SPD under either § 1022(b) or applicable regulations, it is a "faulty" SPD, which means that they must show

that they relied on or were prejudiced by the SPD's deficiencies. This they assert they can do, because they assert that the Schedule of Benefits is quite clear that a member would not pay in excess of the out-of-pocket maximum, and they relied on the Schedule of Benefits to decide to obtain treatment from the Mayo Clinic rather than from a participating provider.

Under the circumstances, the Kittermans assert that their liability should be limited to the out-of-pocket maximum of $8,000, as provided in the Schedule of Benefits, and Coventry should be liable for the rest of their medical expenses incurred at the Mayo Clinic.

### b. Coventry's response

Coventry asserts that the Schedule of Benefits is three pages long, not two, as the Kittermans contend, and that the Kittermans cannot pick and choose the provisions of the Schedule of Benefits on which they choose to rely. Coventry asserts that there is no conflict between the Schedule of Benefits and the terms of the Plan, as set out more fully in the Evidence of Coverage, because both make clear that balances above the out-of-network rate do not apply to the participant's out-of-pocket maximum for non-participating providers. In particular, Coventry points to the bold font warnings on the third page of the Schedule of Benefits and the similar provisions of the Evidence of Coverage. Coventry also asserts that the Schedule of Benefits is *not* an SPD, but even if it is, read as a whole, it is not misleading, erroneous, or otherwise in conflict with the terms of the Plan.

### c. The Kittermans' reply

In reply, the Kittermans assert that the crux of the case is whether or not an average plan participant reading the Coventry Plan and its Schedule of Benefits would believe coverage exists if the plan participant uses an out-of-network provider and how much would the average plan participant be liable for if they chose to use an out-of-network

provider. They assert that, because the Schedule of Benefits does not note restrictions immediately adjacent to the benefits description concerning out-of-pocket maximums, participants are not informed of any restrictions, so they would reasonably believe that none exist. Indeed, the Kittermans assert that an out-of-pocket maximum with all the restrictions that Coventry asserts are applicable is simply not an out-of-pocket maximum at all, so that such a description is misleading. They also reiterate their contention that the Schedule of Benefits is an SPD, but it is misleading and in conflict with the terms of the Plan, so that the Schedule of Benefits must prevail or that they reasonably relied on the description of the out-of-pocket maximum in the Schedule of Benefits.

### 2. Analysis

As noted above, applying the *de novo* standard of review applicable here, the court must give the language of the Plan its common and ordinary meaning as a reasonable person in the position of the Plan participant, not the actual participant, would have understood the words of the Plan. *Adams*, 364 F.3d at 954. Coventry asserts that, applying this standard, the result is inevitable, because no reasonable Plan participant would fail to read the third page of the Schedule of Benefits, which plainly states in the definitions of "Out-of-Network Rate" and "Out-of-Pocket" that certain charges do not "apply" to the "Out-of-Pocket Maximum." Thus, Coventry argues that a reasonable Plan participant would have understood that he or she might be responsible for more—even much more—than $8,000 in charges for services by a non-participating provider. Such an argument would make the Kittermans' misreading of the Schedule of Benefits regrettable, but not reasonable. The court finds, however, that such an argument ultimately does not bear close scrutiny.

First, the court finds that the common and ordinary meaning of "Out-of-Pocket Maximum" to a reasonable Plan participant, as the Kittermans contend, is the greatest

amount that the Plan participant will have to pay for medical services per calendar year, with different amounts specified for the services of participating providers ($4,000 per individual) and for services of non-participating providers ($8,000 per individual). *See* Schedule of Benefits, Administrative Record at 2. The court sincerely doubts that a reasonable Plan participant knows that terms that have such an unambiguous common and ordinary meaning can be defined in a contract to mean something entirely different.

Indeed, the definition of "Out-of-Pocket Maximum" in § 1.7 of the Evidence of Coverage is consistent with the common and ordinary meaning of "Out-of-Pocket Maximum" as the greatest amount that the Plan participant will have to pay per calendar year, whether for services of a participating or non-participating provider. That definition is the following:

> *The individual Out-of-Pocket Maximum is a limit on the amount You must pay out of Your pocket for specified Covered Services in a Calendar Year, as specified in Your Schedule of Benefits.* The family Out-of-Pocket Maximum is the limit on the total amount Members of the same family Covered under this Agreement must pay for specified Covered Services in a Calendar Year. Copayments and financial penalties do not apply to Your Out-of-Pocket Maximum. You will be responsible for office visit Copayments throughout the Calendar Year.

Administrative Record at 13 (emphasis added). The reference back to the Schedule of Benefits in the first sentence of this provision is not a reference back to the definition of "Out-of-Pocket" in the Schedule of Benefits (let alone a reference back to the definition of "Out-of-Network Rate" in the Schedule of Benefits), but to the "Covered Services . . . specified in Your Schedule of Benefits." Thus, the definition in § 1.7 does not direct a reasonable plan participant to some other definition of "Out-of-Pocket Maximum" or to

a list of exclusions from it, nor does it suggest that a Plan participant may end up responsible for some amount greatly in excess of the "Out-of-Pocket Maximum." Similarly, the limitation of "Out-of-Pocket Maximum" to the maximum payment "for specified Covered Services" provides no different meaning, because there is no question that the "services" at issue here were "covered," even if they were provided by non-participating providers, even if the Plan elsewhere attempts to eliminate coverage for all of the *charges* by those non-participating providers for those *services*.

Even though the last two sentences of § 1.7 do explain that the participant "will be responsible for office visit Copayments throughout the Calendar Year," and that "Copayments and financial penalties do not apply to Your Out-of-Pocket Maximum," these limitations do not suggest that "Out-of-Pocket Maximum" is riddled with exclusions, at least for services from non-participating providers. This is so, because the only "copayment" for non-participating provider services identified in the Schedule of Benefits is a $100 co-payment for "Emergency Room Services," Administrative Record at 2, and the only "penalty" identified in the Schedule of Benefits for non-participating provider services is for failure to precertify or preauthorize services. Administrative Record at 3. These exclusions, thus, would not suggest to a reasonable Plan participant that he or she could be responsible for some amount greatly in excess of the "Out-of-Pocket Maximum," and a reasonable Plan participant who is not seeking coverage for emergency services and who has sought and obtained precertification or preauthorization, where the Schedule of Benefits indicates that it is required—*i.e.*, someone in the Kittermans' position—would have no fear of ending up responsible for some amount greatly in excess of the "Out-of-Pocket Maximum," in light of these exclusions, even if he or she used non-participating providers.

Because "Out-of-Pocket Maximum" has a common and ordinary meaning, and that meaning is the annual maximum for which the participant will be responsible, the question is whether a reasonable Plan participant would ever discover that the term purportedly has a very different meaning under this Plan, at least in the case of services from a non-participating provider. Coventry asserts that the definitions of "Out-of-Network Rate" and "Out-of-Pocket" on the third page of the Schedule of Benefits, which a reasonable Plan participant would also have read, even if the Kittermans did not, provides clearly that the participant may be responsible for much more, because those definitions say so, and in bold type. Yet, the court finds that the bold language in these definitions is, at best, ambiguous, because it says that certain "charges" or "balances" above the Out-of-Network Rate for non-participating providers "do not apply to your Out-of-Pocket Maximum." Administrative Record at 4. The same "does not apply" language also appears in § 1.4 of the Evidence of Coverage, defining "Non-Participating Providers," *see* Administrative Record at 15 ("You are liable for any difference between the billed charge and Our allowed amount. This difference does not apply to Your Out-of-Pocket Maximum."), and § 13.42 Out-of-Pocket Maximum ("You are responsible for Charges that exceed our Out-of-Network Rate for non-participating providers. This could result in You having to pay a significant portion of Your claim. Balances above the Out-of-Network Rate do NOT apply to Your Out-of-Pocket Maximum."). Administrative Record at 73.

The common and ordinary meaning of "apply," in the only sense possible here, is "to have relevance or a valid connection <this rule *applies* to freshmen only>," *Merriam-Webster's Collegiate Dictionary* (10th ed. 1995) (emphasis in the original), or "[t]o have a practical bearing upon something; to have valid or suitable reference *to*." *Oxford English Dictionary* (on -line ed.) (emphasis in the original). But in what way is the balance above the Out-of-Network Rate for Non-Participating Providers or the difference

between the billed charge and the insurer's allowed amount *not* "relevant to" or *not* "connected to" or have *no* "practical bearing upon" the "Out-of-Pocket Maximum"? Coventry apparently asserts that the unambiguous meaning of the "does not apply" language is that balances or charges in excess of the Out-of-Network Rate do not "count in" or are "excluded from" the Out-of-Pocket Maximum. Thus, Coventry asserts that the Plan participant is liable not only for the Out-of-Pocket Maximum, but also for those additional amounts. However, this construction of "apply" is irreconcilably contrary to the common and ordinary meaning of "Out-of-Pocket Maximum" as the greatest amount that the Plan participant will have to pay per calendar year, whether for services of a participating or non-participating provider.

Indeed, if Coventry's construction is accepted, then "Out-of-Pocket Maximum" means two entirely different things, depending upon whether the services in question were provided by a participating provider or a non-participating provider. If the services were provided by a participating provider, then the "Out-of-Pocket Maximum" is, indeed, the greatest amount that the plan participant will have to pay per calendar year. In contrast, in the case of services from a non-participating provider, the "Out-of-Pocket Maximum" is not only *not* the greatest amount that the plan participant will have to pay per calendar year, it is effectively no limit at all on the charges for which the plan participant could ultimately be responsible. As this case demonstrates, the exclusion from the so-called "Out-of-Pocket Maximum" of charges above the insurer's allowed rate for services from a non-participating provider would mean that the Plan participant may ultimately be responsible for charges amounting to two, three, or several times the "Out-of-Pocket Maximum" during a calendar year. Even when a plan administrator's interpretation is reviewed for abuse of discretion, the administrator's interpretation is unreasonable if it renders any of the plan's language internally inconsistent or meaningless. *See, e.g., Herbert v. SBC Pension Benefit Plan*, 354 F.3d 796, 799 (8th Cir. 2004). Indeed, to use

the term "Out-of-Pocket Maximum" in the context of services from participating providers and in the context of services from non-participating providers, when it does mean a limit on the charges for which the Plan participant would be responsible in the first context, but does not mean any limit at all on the charges for which the Plan participant may ultimately be responsible in the second context, is inherently misleading.

Rather than read the "does not apply" language to create irreconcilably different meanings for "Out-of-Pocket Maximum" as it relates to services from participating providers or non-participating providers, then, a reasonable Plan participant could understand the "does not apply" language to mean that the balance above the Out-of-Network Rate for Non-Participating Providers or the difference between the billed charge and the insurer's allowed amount is simply *not relevant to* the "Out-of-Pocket Maximum," in the sense that it *does not change* the "Out-of-Pocket Maximum," even if the Plan participant might *otherwise* be liable for that balance or difference *up to* the "Out-of-Pocket Maximum."

Because "Out-of-Pocket Maximum" is not ambiguous, in and of itself, when given its common and ordinary meaning to a reasonable Plan participant, it is of no moment that the Evidence of Coverage cautions the Plan participant to "**READ AND RE-READ [THE EVIDENCE OF COVERAGE] IN ITS ENTIRETY**." Administrative Record at 8 (emphasis in the original). No amount of reading or re-reading of the Evidence of Coverage or the Schedule of Benefits would eliminate the irreconcilable conflict between the meanings of "Out-of-Pocket Maximum" as the greatest amount that the plan participant will have to pay per calendar year for services of participating providers, but as no limit at all on what the plan participant will have to pay for services of non-participating providers.

Thus, giving the "Out-of-Pocket Maximum" language of the Plan its common and ordinary meaning as a reasonable person in the position of the Plan participant, not the

actual participant, would have understood the words of the Plan, *Adams*, 364 F.3d at 954, the "Out-of-Pocket Maximum" identified for either participating providers ($4,000) or non-participating providers ($8,000) is the greatest amount that the plan participant will have to pay per calendar year for those services. In this case, the Kittermans are, therefore, responsible for no more than $8,000 for Diane's services from the Mayo Clinic.

This conclusion makes it unnecessary for the court to consider whether the Schedule of Benefits or any other document provided to the Kittermans was an SPD, let alone whether any such SPD was adequate, or consistent with the terms of the Plan, or whether the Kittermans relied on the SPD to their detriment. Under the circumstances, Coventry's refusal to pay for services in excess of the Out-of-Pocket Maximum for non-participating providers was *inconsistent* with the common and ordinary meaning, to a reasonable Plan participant, of "Out-of-Pocket Maximum." Coventry is liable for all charges in excess of $8,000 on the Kittermans' claim.

## III. CONCLUSION

Upon *de novo* review in this judicial review pursuant to ERISA of the denial of health insurance benefits, the court finds that Coventry's denial of benefits must be and is **reversed**, and the Kittermans' claim for payment of all charges in excess of $8,000 must be and is **granted**.

**IT IS SO ORDERED.**

**DATED** this 15th day of March, 2010.

MARK W. BENNETT
U. S. DISTRICT COURT JUDGE
NORTHERN DISTRICT OF IOWA